**UNITED STATES, Appellee,**

**v.**

**Igor BRUNSHTEIN, also known as "Mark," Defendant–Appellant.**

**Docket No. 02–1345.**

United States Court of Appeals, Second Circuit.

Argued: March 25, 2003.

Decided: Sept. 9, 2003.

Jennifer G. Rodgers, Assistant United States Attorney (Andrew J. Ceresney, Assistant United States Attorney, on the brief), for James B. Comey, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Thomas H. Nooter, Freeman, Nooter & Ginsberg, New York, NY, for Defendant–Appellant.

Before: KATZMANN, B.D. PARKER, JR., and RAGGI, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Igor Brunshtein appeals from a judgment of the United States District Court for the Southern District of New York (Griesa, *J.*), following his conviction for bribing a New York City Department of Finance official, in violation of 18 U.S.C. § 666(a)(2), to induce him to eliminate taxes on various parcels of real property in New York City, the recipient of substantial federal funds. To obtain a conviction under this statute, the Government was required to prove, among other things, a nexus between the bribe and federal funds—in particular, that a connection existed between the bribe and a risk to the integrity of a federally funded program.

*See United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir.1999). After the presentation of the evidence at trial, the district court ruled that whether this federal nexus existed was for the court rather than the jury to decide and that the Government had sufficiently proven the nexus. On appeal, Brunshtein challenges these rulings and raises sentencing and evidentiary issues as well. For the reasons that follow, we affirm.

## BACKGROUND

The Government's evidence established that in mid–1994 the New York City Department of Investigations (the "DOI") started an investigation into corruption in the Brooklyn office of the New York City Department of Finance (the "DOF"), which, among other things, processes the payment of real property tax bills. The investigation revealed that several employees at the Brooklyn office had accepted bribes in return for deleting outstanding property tax bills from the office's computer records. In March 1996, several employees were arrested, including Mariano Ventura.

Ventura agreed to cooperate with the Government and admitted that from 1992 until mid–1995 he had accepted bribes in exchange for manipulating the DOF's computer system to make it appear that outstanding property taxes had been paid. Ventura acknowledged that he had received approximately $250,000 in bribes and, in return, with two other DOF employees, had illegally eliminated approximately $13 million in property taxes. As part of his cooperation, Ventura continued

to work for the DOI undercover at the Brooklyn office.

In September 1996, Brunshtein introduced himself to Ventura over the phone, claiming to be calling on behalf of one Ed Herbst to arrange a meeting with Ventura. Ventura had previously accepted bribes to eliminate property taxes owed by Herbst and agreed to meet him the following day. When Ventura arrived at the agreed-upon meeting place, he found Brunshtein, not Herbst. Brunshtein introduced himself again to Ventura, and later that day Brunshtein contacted Ventura to ask about eliminating property taxes.

Brunshtein and Ventura met on five more occasions. At the second of these meetings, on October 8, Brunshtein provided Ventura with a detailed list of real properties (the "first set of properties"), and the two men agreed that Ventura would erase the property taxes for properties in exchange for a cash payment of 10 percent of the taxes eliminated. Ultimately, however, these taxes were not eliminated.[1]

The next day Brunshtein called Ventura, and Ventura told him that $481,000 was owed on the listed properties. On October 10, Brunshtein contacted Ventura and told him that he would have the bribe money for the listed properties the following week. In addition, Brunshtein asked Ventura to erase immediately the property taxes for two additional properties (the "second set of properties"). Ventura later informed Brunshtein that approximately $109,000 was owed through July 1997 on the second set of properties.

---

1. After the conclusion of the trial, Brunshtein learned that the owner of the first set of properties had been a confidential government informer. In a motion for a new trial, and now on appeal, Brunshtein contended that this fact was *Brady* material and should have been disclosed to him earlier by the Government, since it would have enabled him to mount an entrapment defense. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Ventura met with Brunshtein on October 22 and gave him receipts showing the purported payment of property taxes through December 1996 on the second set of properties. In exchange, Brunshtein gave Ventura a $1,000 down payment on his bribe. On October 25, Brunshtein and Ventura met again. Brunshtein paid Ventura an additional $4,000, and Ventura presented Brunshtein with receipts showing the purported payment of the property taxes on the second set of properties through July 1997.

In an October 28 telephone conversation, Brunshtein told Ventura about seven additional properties (the "third set of properties") on which he wanted property taxes eliminated. The next day Ventura informed Brunshtein that approximately $64,000 in taxes were outstanding on these properties, and Brunshtein, in turn, asked Ventura to eliminate the taxes on the following day. Ventura and Brunshtein met for the last time on October 30 and Brunshtein gave Ventura an additional $2,000 towards eliminating the taxes on the second set of properties.

On November 22, the DOI arrested nearly 30 people on bribery charges resulting from the undercover operation involving Ventura. Brunshtein was subsequently arrested in Florida in April 2000 on unrelated charges and was convicted and sentenced for visa fraud. Afterwards, Brunshtein was transferred to the Southern District of New York to face a one-count indictment charging him with violating 18 U.S.C. § 666(a)(2).

Brunshtein moved to dismiss the indictment on the ground that the Government could not demonstrate at least some connection between the bribe and a risk to the integrity of a federally funded program. *See United States v. Santopietro,* 166 F.3d 88, 93 (2d Cir.1999). The DOF, Brunshtein contended, did not administer any federal-ly funded programs—instead it served simply as a conduit for federal funds to other City agencies, which in turn administered the programs. The district court ruled the indictment sufficient but indicated that the issue of whether the court or jury would decide the federal-nexus issue would remain open during trial.

In the course of trial, the Government called Ventura to testify about his dealings with Brunshtein. In addition, the Government presented witnesses who testified about the DOF's receipt of federal funds. Warren Ruppel, New York City's Assistant Comptroller for Accounting, testified that the Comptroller's Office and the DOF jointly managed the City's treasury, whose revenue included both property tax receipts and federal funds. Ruppel explained that, as part of their joint administration of the treasury, both the Comptroller's Office and the DOF have to "sign off on all expenditures out of the account, which would include federal funds." Ruppel testified that the federal government had contributed approximately $8.5 billion to the City in 1996 and that property taxes had accounted for $7 billion of the City's revenue that year. Ruppel also testified that any bills paid by City agencies are paid out of a joint account held by the Comptroller's Office and the DOF. According to Ruppel, in 1996 New York City received block grants from the federal government over which the City had some discretion in spending within a "broad subject matter." For example, the City received a federal block grant of approximately $250 million for community development, but this money was not earmarked for any particular program.

The Government also called Stuart Klein, the first deputy director of the City's Office of Management and Budget. Klein testified that the City had received

federal block grants in 1996, including grants that helped fund particular City social services agencies. In addition, with regard to City programs such as day care and Medicaid, Klein explained that some federal assistance came in the form of matching grants, which required the City to spend a certain amount. Thus, he testified, shortfalls in property tax revenue might lead to reductions in federal funds as a consequence of the City's inability to spend enough to qualify for certain federal matching grants. Specifically, Klein testified, "When a check comes from the federal government, it goes to the Department of Finance who actually performs the treasury function for the city and the banking function." Klein also testified that "when checks are drawn on the city treasury, the commissioner of finance signs the check."

Brunshtein called no witnesses, but he attempted to undermine the credibility of the Government's witnesses through cross-examination and suggested that he would not have had a motive to eliminate taxes for properties he did not own.

During the trial, the parties and the district court continued to discuss whether the federal-nexus issue would be decided by the court or the jury. At the conclusion of the presentation of the evidence, the district court informed the parties that it would decide the issue. The court then held that such a nexus had been established and, over Brunshtein's objection, did not instruct the jury on the nexus requirement.

Following his conviction, Brunshtein moved for a new trial, arguing that the Government had improperly suppressed exculpatory information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)—in particular, that a DOI agent had compiled the list of the first set of properties with the cooperation of the owner, a federal informer.

Brunshtein contended that, with this information, he might have been able to advance an entrapment defense by showing that the Government had furnished him with the list of the first set of properties in order to induce him to commit a crime. The district court denied Brunshtein's motion, noting that the property owner and list in question at most

> related to the first set of properties. There is no suggestion that the [owner] was involved in the second and third sets of properties, and the bribes were paid only in relation to the second set. Moreover, on the issue of predisposition, the evidence is overwhelming that defendant undertook the criminal conduct involved in this case in an entirely ready and willing fashion.
>
> The Court concludes that the evidence about the [owner] holds out no possibility of defendant obtaining an acquittal in a new trial.

*United States v. Brunshstein,* No. 98 Cr. 769, 2002 WL 987275, at *2 (S.D.N.Y. May 13, 2002).

Brunshtein was sentenced to 30 months' incarceration and three years' supervised release. Brunshtein appealed, principally contending that the federal-nexus requirement under 18 U.S.C. § 666(a)(2) was a question for the jury, not the court, and, in any event, had not been met.

## DISCUSSION

Under 18 U.S.C. § 666(a)(2):

Whoever, if the circumstance described in subsection (b) of this section exists—

. . .

corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business,

transaction, or series of transactions of such organization, government, or agency involving anything of value of $ 5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

Section 666(b) requires that the relevant "organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

Looking at the statute's legislative history, we note that "[t]he purpose of this section [is] to protect the integrity of the vast sums of money distributed through federal programs." S.Rep. No. 98–225, at 370 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3511. In the past, we have remarked that Congress enacted § 666 to "safeguard finite federal resources from corruption and to police those with control of federal funds." *United States v. Rooney,* 37 F.3d 847, 851 (2d Cir.1994). Put another way, "Congress [sought] to preserve the integrity of federal funds by assuring the integrity of the organization that receives them." *United States v. Bonito,* 57 F.3d 167, 172 (2d Cir.1995) (internal quotation marks omitted). In general, courts have broadly interpreted the behavior proscribed by § 666, holding that the $10,000 in federal funds received need not be "directly linked to the program that was the subject of the bribe," *United States v. Coyne,* 4 F.3d 100, 109 (2d Cir.1993), and that § 666's "prohibition is not confined to a business or transaction which affects federal funds." *Salinas v. United States,* 522 U.S. 52, 57, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

On its face, the statute does not require the bribe to have affected the integrity of a federally funded program, and the Supreme Court has reserved decision on the matter. *See Salinas,* 522 U.S. at 59, 118 S.Ct. 469 ("We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by federal funds themselves."). We, however, addressed the issue in *Santopietro.* Relying on our previous decision in *United States v. Foley,* 73 F.3d 484 (2d Cir.1996), we held, as noted above, that § 666(a)(2) requires that the Government show "at least some connection between the bribe and a risk to the integrity of [a] federal funded program." *Santopietro,* 166 F.3d at 93.[2] We have read this jurisdictional requirement into the statute to avoid the constitutional problem of an overextension of federal power into local criminal matters not affecting the disposition of federal funds. *See id.; Salinas,* 522 U.S. at 61, 118 S.Ct. 469 (noting that where there is "a threat to the integrity and proper operation of the federal program," "the application of § 666[ ] . . . [does] not extend federal power beyond its proper bounds").

## I.

Although conceding that Congress had the power to enact § 666 based upon the Spending Clause of Article I of the Constitution, *see generally Fischer v. United States,* 529 U.S. 667, 689 n. 3, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000) (Thomas, J., dissenting), Brunshtein argues that § 666, insofar as it contains *Santopietro*'s federal-nexus requirement, is unconstitutionally

---

**2.** Other circuits have split over whether the Government must establish such a nexus. *Compare United States v. Zwick,* 199 F.3d 672, 687 (3d Cir.1999) (nexus required); *United* States v. Moeller, 987 F.2d 1134, 1137 (5th Cir.1993) (same); *with United States v. Sabri,* 326 F.3d 937, 945 (8th Cir.2003) (none required).

vague as applied to him, contending that other cases that have imposed a nexus requirement involved bribes to officials who had responsibility for federal funds or who made decisions regarding the allocation of federal money, rather than bribes to officials who merely passed funds through to partially federally-funded programs. (Br. of Appellant at 25–26.) Moreover, Brunshtein maintains: "[W]here the only connection is that the local entity—in this case the City of New York—receives federal funds for purposes unrelated to the local official being bribed, and the person who is to be bribed has no direct or indirect influence over these funds, the vagueness becomes apparent." (*Id.* at 28.)

■ According to the void-for-vagueness doctrine, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks and citations omitted). "In short, the statute must give notice of the forbidden conduct and set boundaries to prosecutorial discretion." *United States v. Handakas,* 286 F.3d 92, 101 (2d Cir. 2002).

■ We find that *Santopietro*'s federal-nexus requirement conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding. *Santopietro* sets forth a clear, specific requirement: a "connection between the bribe and a risk to the integrity of the federal funded program." 166 F.3d at 93. The statutory elements and *Santopietro*'s federal-nexus requirement provide an ordinary person with fair notice that bribing an official who works for a City agency that receives federal funds and that is charged with disbursing those funds to implement City programs may result in prosecution. The federal government has an obvious interest in the incorruptibility of the City officials who are responsible for ensuring the transmission of federal funds to specific City programs. *See Foley,* 73 F.3d at 492 (" 'It is sufficient that Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organization that receives them.' ") (quoting *United States v. Westmoreland,* 841 F.2d 572, 578 (5th Cir.1988), and *United States v. Bonito,* 57 F.3d 167, 172 (2d Cir.1995)). Consequently, the federal-nexus requirement is not unconstitutionally vague as applied in this case.

## II.

Brunshtein next argues that the federal-nexus question should have been decided by the jury instead of the court[3] and, in any event, that there was insufficient evidence for a jury to find that such a nexus existed. The district court, reasoning that the nexus requirement was relevant to § 666's constitutionality but was not an element of the offense, concluded that it presented a question of law and ruled that the Government's proof established the nexus. In *Santopietro,* we declined to answer this question because it had not been preserved for review. 166 F.3d at 94. In this case, however, the issue was raised

**3.** Brunshtein also challenges the timing of the district court's resolution of this question, noting that his counsel had raised this issue to the jury in his opening statement. Any delay in the court's decision to resolve the issue itself did not prejudice Brunshtein, especially in light of the court's curative instruction to the effect that defense counsel's failure to mention the nexus requirement in his summation was caused by legal rulings by the court, not by poor advocacy.

below and consequently is properly before us.

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Sixth Amendment guarantees the accused a trial by jury. *See* U.S. Const. amend. 6. "Taken together, these rights indisputably entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (internal quotation marks and alterations omitted).

As we have seen, although the text of § 666 does not explicitly contain a federal-nexus requirement, our holding in *Santopietro* required that the government prove "at least some connection between the bribe and a risk to the integrity of the federal funded program." 166 F.3d at 93. The assessment of risk is inherently a fact-based inquiry. In this case, Ruppel and Klein described the functioning of the DOF and its relationship to federal funds flowing into the City. This testimony concerned facts, not law. We see no reason to treat the facts sought to be adduced by this testimony differently from other facts the Government must also prove in order to secure a conviction under § 666. Moreover, we have no difficulty imagining cases where the existence of the required connection will be the subject of conflicting testimony and competing inferences. Under our system, resolving conflicts and weighing inferences is a responsibility traditionally assigned to the jury, not the court. In *United States v. Vasquez,* 267 F.3d 79, 87 (2d Cir.2001), we concluded that proof of a jurisdictional nexus was an issue of fact for a jury. Specifically, we noted that an "[e]ffect on interstate or foreign commerce is the jurisdictional element of a [Violent Crimes in Aid of Racketeering] offense," "the government is required to provide evidence of such an effect[,] ... [and] the jury is constitutionally required to determine, as an element of a VCAR offense, whether the racketeering enterprise affected interstate or foreign commerce."

Here, too, a federal nexus is a "fact[ ] which must exist in order to subject the defendant to a legally prescribed punishment" and, accordingly, this fact *"must* be found by the jury." *Apprendi,* 530 U.S. at 499, 120 S.Ct. 2348 (Scalia, J., concurring) (emphasis in original). We conclude that a federal nexus is an element of § 666 that must be charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt. *See generally United States v. Thomas,* 274 F.3d 655, 661 (2d Cir.2001) (en banc) (citing *Jones v. United States,* 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). Accordingly, the district court erred in refusing to submit this element to the jury.

### III.

In *Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the Supreme Court concluded that the failure to submit an element of a crime to a jury "is an error that is subject to harmless-error analysis." The Court found that, although "materiality" was an element of the charged tax fraud offense and the district court had not instructed the jury as to materiality, this error was harmless and did not warrant reversal. *Id.* at 16–20, 119 S.Ct. 1827; *see also United States v. Friedman,* 300 F.3d 111, 127–28 (2d Cir.2002) (applying harmless error analysis to alleged omission of element

from jury instructions), *cert. denied,* —— U.S. ——, 123 S.Ct. 1785, 155 L.Ed.2d 672 (2003). In reaching this conclusion, the *Neder* Court asked itself, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" 527 U.S. at 18, 119 S.Ct. 1827.

Brunshtein argues that there was insufficient evidence for a jury to have found that a federal nexus existed and that, consequently, the district court's decision to reserve the nexus issue to itself resulted in non-harmless error. It is undisputed that in 1996 Brunshtein paid $7,000 in bribes to an agent of the DOF to eliminate property taxes, worth more than $100,000, and that the City treasury, which the DOF administered and into which these taxes would have been deposited, received more than $10,000 in federal funds in the same year. Here, testimony from Ruppel and Klein established that the DOF—in concert with the Comptroller's Office—administered the treasury, into which federal funds were deposited. Ruppel testified that the DOF was required to "sign off on all expenditures out of the account, which would include federal funds," and Klein described how the DOF, while not making decisions as to the allocation of City funds, played an integral role in ensuring that the federal funds in the treasury reached their intended recipients.

*Santopietro* requires only a "risk" to, not an actual impairment of, the integrity of federal funds or a federally funded program. 166 F.3d at 93. As we have previously recognized, the integrity of federal funds is placed at risk when the agency that receives those funds is corrupted. *See Foley,* 73 F.3d at 492. In this case the amount of federal funds received by the DOF was approximately $8.5 billion, representing more than one quarter of the City's annual $32 billion revenue. It does

not matter that the DOF was not the ultimate intended beneficiary of any federal funds. *Cf. United States v. Zyskind,* 118 F.3d 113, 116 (2d Cir.1997) ("We conclude that § 666 was designed broadly to prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are 'disbursed' for further 'distribution' to or for the benefit of the individual beneficiaries."). Neither does it matter that the particular charged bribery did not affect any federal funds. *Salinas,* 522 U.S. at 59, 118 S.Ct. 469. Any corruption of a city agency entrusted with federal funds potentially puts those funds at risk. *See United States v. Bonito,* 57 F.3d 167, 173 (2d Cir.1995) (noting that "the corruption of an organization's official in the administration of non-federal monies can trigger § 666 because of the indirect infection of the federal monies that organization receives"). This is not a case where the Government has "use[d] section 666[ ] to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $ 10,000." *Santopietro,* 166 F.3d at 93. Rather, this is a case in which a city agency, the DOF, itself received billions of dollars in federal funds to disburse to their intended beneficiaries; consequently, any corruption within that agency was a proper matter of federal concern.

In sum, although the jury should have decided the federal-nexus issue, because the government's proof clearly established a connection between Brunshtein's bribery of a DOF employee and a risk to the integrity of federal funds entrusted to the DOF, we can confidently conclude beyond a reasonable doubt that any rational jury would have found the nexus element proved. Accordingly, the court's error in

failing to charge the jury on this element was harmless.

## IV.

After his conviction, Brunshtein unsuccessfully moved for a new trial on the ground that the Government had not turned over exculpatory evidence to him, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Brunshtein renews this argument on appeal, contending that the Government failed timely to disclose to him that the list of the first set of properties had been prepared by the DOI in conjunction with a federal informer, *i.e.,* the owner of these properties, who was participating in a similar investigation in the Eastern District of New York. Arguing that he did not have an opportunity to determine whether a Government agent supplied him with the list that the DOI had compiled, Brunshtein maintains that this evidence was probative of whether he was entrapped by an agent of the DOI. *See United States v. Damblu,* 134 F.3d 490, 495 (2d Cir.1998) (stating that the elements of the affirmative defense of entrapment are that "(1) the government by its conduct induced the commission of the crime for which the defendant is being prosecuted, and (2) the defendant lacked a predisposition to engage in such criminal conduct").

■ An appellant seeking a new trial on the basis of an alleged *Brady* violation bears the burden of demonstrating both that the Government suppressed exculpatory information and that this information was material. *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995). Allegedly suppressed evidence is material, for these purposes, " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 1209 (quoting *United States v. Bag-*

*ley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.)).

■ We review a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Thomas,* 303 F.3d 138, 142 (2d Cir.2002). Here, the district court did not abuse its discretion. As the district court noted in denying Brunshtein's motion, the DOI and the federal informer were involved only in the preparation of the list of the first set of properties and there was no contention that Brunshtein paid bribes with respect to them. Significantly, Brunshtein does not contend that the DOI or a federal informer was involved in the compilation of the list of the second set of properties, with regard to which Brunshtein actually paid bribes to Ventura. For these reasons, evidence that the first set of properties may have been compiled by a government agent was not exculpatory and thus was not required by *Brady* to be disclosed. *See generally United States v. Gil,* 297 F.3d 93, 104 (2d Cir.2002); *United States v. Esposito,* 834 F.2d 272, 275 n. 1 (2d Cir.1987) ("Since this was not exculpatory evidence, *Brady* is inapplicable.") (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194).

■ Even if information concerning the Government's role in the creation of the list of the first set of properties were exculpatory, the Government's proof at trial included abundant evidence of Brunshtein's predisposition to commit the offense, evidence which would have defeated an entrapment defense. *See United States v. Hurtado,* 47 F.3d 577, 585 (2d Cir.1995). "Predisposition may be shown by evidence of: (1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is

charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Salerno,* 66 F.3d 544, 547 (2d Cir.1995) (internal quotation marks omitted and alteration in original). Here, the Government presented evidence that Brunshtein repeatedly paid bribes to Ventura to eliminate property taxes on the second set of properties, *see United States v. Roland,* 748 F.2d 1321, 1327 (2d Cir.1984) (allowing jury to infer predisposition from "series of illegal payments"), and repeatedly contacted Ventura and initiated meetings to urge him to eliminate property taxes. Thus, evidence of Brunshtein's predisposition was compelling. In light of these factors, we conclude that the district court acted well within its discretion in concluding that access to the allegedly suppressed information would not have resulted in a "reasonable probability" of acquittal. *Payne,* 63 F.3d at 1209.

## V.

■ Finally, Brunshtein challenges the district court's refusal to make a downward sentence adjustment as a consequence of what he terms his minor role in the offense charged. The Sentencing Guidelines provide that a defendant's base offense level may be reduced by two levels if the defendant was a "minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). The Guidelines' commentary defines a "minor participant" as a participant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, cmt. n. 5. A defendant has the burden of showing by a preponderance of the evidence that he was a "minor participant." *United States v. Castano,* 234 F.3d 111, 113 (2d Cir.2000).

■ "We review for clear error a sentencing court's finding that a defendant did not play a minor role in the offense." *Id.* There was no error here. The evidence demonstrated that Brunshtein played a significant and proactive role: he initiated contact with Ventura, met with him repeatedly, gave him lists of properties, reached an agreement with him to pay bribes worth 10 percent of the value of the taxes eliminated, and offered and paid bribes to him in exchange for the deletion of tax bills from the City's computer records. Consequently, he was not entitled to a minor role adjustment.

## CONCLUSION

The judgment of the district court is AF-FIRMED.