**UNITED STATES of America, Appellee,**

v.

**Benjamin BONITO, Jr., Defendant–Appellant.**

**No. 1125, Docket 94–1273.**

United States Court of Appeals, Second Circuit.

Argued Feb. 24, 1995.

Decided June 8, 1995.

Steven Duke, New Haven, CT (Robert Casale, Branford, CT, Ashlie Berenger, Shawn Chen, Allegra Lawrence, Richard St. John and Grant Vinik, New Haven, CT, on brief), for appellant Bonito.

Joseph C. Hutchinson, Asst. U.S. Atty., New Haven, CT (Christopher F. Droney, U.S. Atty., on the brief), for appellee.

Before: NEWMAN, Chief Judge, VAN GRAAFEILAND and COFFIN,* Circuit Judges.

COFFIN, Senior Circuit Judge.

Benjamin Bonito was convicted of violating 18 U.S.C. § 666,[1] which proscribes bribery of officials of public and private entities receiving federal funds, and conspiracy to violate § 666. He was indicted for giving an automobile to a city of New Haven real estate official to influence the purchase of his "Bonito Village" by the state-created New Haven Housing Authority, and also to steer New Haven tenants to his properties. He challenges the jury instructions, the sufficiency of the evidence, and his sentencing. We affirm.

---

* The Honorable Frank M. Coffin of the United States Court of Appeals for the First Circuit, sitting by designation.

1. The particular provision was § 666(a)(2), which states:

 (a) Whoever, if the circumstance described in subsection (b) of this section exists—
 (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
 shall be fined under this title, imprisoned not more than 10 years, or both.
 (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000....
 18 U.S.C. § 666.

## I. *Background*

Benjamin Bonito was a landlord and real estate developer in the New Haven area. He was charged in the indictment with giving a car bribe to his co-defendant at trial, Joseph DeMatteo, who was the Director of Real Estate Services for the City of New Haven and also a member of a joint New Haven–New Haven Housing Authority committee established to select sites for low income housing. The New Haven Housing Authority is an organization created by Connecticut statute, *see* Conn.Gen.Stat. § 8–40, which administers projects funded by the federal Department of Housing and Urban Development (HUD), and operates under close HUD supervision. It exists independently of the City of New Haven, which is a municipality of the state of Connecticut.

Bonito purchased a 1991 Mercury Tracer at a fundraising auction in October 1990 for $9,500. He paid for the car, but never picked it up from the lot. Instead, three months later, DeMatteo, who had originally obtained the car from a local Budget Rent-a-Car for the auction organizing committee, paid the tax and registration fee on the vehicle and took possession of it. Budget transferred the title directly to DeMatteo, though no Budget employee could remember receiving authorization from Bonito to do so. Bonito later told the police that he had bought the car at DeMatteo's request.

On January 25, 1991, DeMatteo executed a document captioned "Promissory Note." According to Bonito's statement to the police, the Note guaranteed repayment for the car. On its face, the Note described a repayment schedule for an interest free loan from Bonito in the amount of $8,200, with no mention of the car or description of the consideration given. DeMatteo was to pay monthly installments of $300 for one year starting on February 15, 1991, with the balance due in February 1992. Any default made the entire balance payable immediately and triggered a 10% interest rate. DeMatteo never made any payments on the Note. Nonetheless, Bonito did not bring suit to collect until June 30, 1992, when a corruption investigation was well under way.

The car allegedly was given primarily in connection with Bonito's attempted sale of Bonito Village to the Housing Authority. The government introduced evidence showing that Bonito had tried unsuccessfully to sell the property on the open market, and had tried but failed to sell the property to the Housing Authority in 1989. In 1990, DeMatteo was appointed to represent New Haven on a joint New Haven–Housing Authority committee established by the mayor to identify and approve sites for a few hundred units of low income housing to be purchased by the Housing Authority. The relationship between the two entities was one of cooperation; while final legal authority to choose sites may have remained with the Housing Authority, the mayor had issued a directive saying that his approval was required. During the months following the car transfer, DeMatteo allegedly used his position on the committee to advance the Housing Authority's purchase of Bonito Village in a number of ways: he set up meetings between Bonito and an aide to the Mayor concerning the deal; he became involved in the negotiations over price; and he contacted both New Haven and Housing Authority officials involved in the decision making process to try to push the deal through. Government evidence showed that DeMatteo frequently met with Bonito throughout this period of advocacy, during which DeMatteo's installment payments on the Note were falling due, and going unpaid. On April 4, 1991, the Housing Authority submitted a proposal to HUD to purchase Bonito Village for over $1.1 million. HUD rejected the deal, citing excessive price, the presence of hazardous conditions on the property, and problems with maintaining the property's one accessible road.

The government's secondary theory was that, once the Bonito Village deal fell through, DeMatteo found an alternate means to benefit Bonito. DeMatteo served as the administrator of a federal program by which occupants of condemned buildings were given temporary housing pending permanent relocation. Two months after HUD rejected the purchase of Bonito Village, DeMatteo directed his assistant to place two such displaced tenants in Bonito-owned properties and au-

thorized payment of $12,800 to Bonito. The government argued that several facts surrounding these placements support the inference that they were connected to the car bribe. First, Bonito's buildings had never before been used. Second, the daily rate asked by Bonito and approved by DeMatteo resulted in a payment of $2,150 on September 21, 1991, six days after DeMatteo had failed to pay $2,400 on the Note for the car. Finally, New Haven had a policy of securing permanent replacement housing as quickly as possible, but the two tenants remained in Bonito's "temporary" housing for four and five months, respectively, at which time they were converted into "permanent" residents and their rents decreased.

## II. *Discussion*

Bonito challenges his conviction and sentence on several grounds. We address them seriatim.

### A. *The Jury Charge*

■ Bonito argues that the instructions were faulty in three basic respects. We note that he failed to lodge any objection to the instructions below, so we review for plain error only. Fed.R.Crim.P. 52(b); *United States v. Aulicino*, 44 F.3d 1102, 1109 (2d Cir.1995). A defendant satisfies this standard by showing that there was error, that it was clear or obvious, and that it affected a substantial right. *United States v. Olano*, —— U.S. ——, —— – ——, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993); *United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994). None of his assigned errors meets this stringent test.

#### 1. The Gratuity Claim

■ Bonito's first claim is that § 666 applies only to bribery, and not gratuities. He argues that the court's instructions erroneously told the jury to convict if he corruptly gave DeMatteo a thing of value in connection with any business "past, present or future," and incorrectly defined the word "corrupt." These errors, he maintains, allowed conviction without requiring the jury to find the requisite mens rea for bribery.

In *United States v. Crozier*, 987 F.2d 893, 898–99 (2d Cir.1993), we held that the former version of § 666 applied to both illegal gratuities and bribes. Bonito argues that the new version does not because it no longer contains the language upon which the *Crozier* court relied for its holding. Fatal to his argument, however, is the fact that the deleted language has been replaced with language that is to the same effect. *Compare id.* at 899 (under the former version of § 666, the payment must be "for or because of" the official conduct) *with* § 666(a)(1)(B) (under the current version, the payment must be "to influence or reward" the official conduct). Thus, the current statute continues to cover payments made with intent to reward past official conduct, so long as the intent to reward is corrupt.

■ Bonito also argues that the term "corrupt" was inadequately explained to the jury. We disagree. The court specifically instructed that the government had to prove that Bonito acted with corrupt intent, which it defined as acting

> voluntarily and intentionally and with the purpose, at least in part, of accomplishing either an unlawful end result or a lawful end result by some unlawful method or means. A person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a government agent in connection with his official duties.

Because it told the jury that the bribe had to be made "with the purpose ... of accomplishing ... an ... end," this instruction made clear that the corrupt agreement, offer or payment must precede the official act to be influenced or rewarded. It then accurately tracked the statutory language as an example. No more was required. *Cf. United States v. Medley*, 913 F.2d 1248, 1261 (7th Cir.1990) (failure to use the word "corrupt" not plain error where jury was told that defendant must have accepted or agreed to accept payment intending to be influenced or rewarded in his official conduct).

#### 2. The Relevant Governmental Unit

Bonito makes a two-pronged argument that his conviction was based on an imper-

missible reading of § 666(a)(2). The first, initially raised as part of his Rule 29 motion for judgment of acquittal, is that any bribery of DeMatteo for trying to advance the purchase of Bonito Village by the Housing Authority could not have been in connection with the "business, transaction or series of transactions" of New Haven involving at least $5,000, because no New Haven funds were implicated by the Bonito Village deal. The second is that the jury was erroneously instructed to convict if it found that DeMatteo was influenced or rewarded in connection with "*any* local government business or transaction" (emphasis added), since this would allow the jury to convict if it found that the bribe was given in connection with Housing Authority business, i.e., its hoped for purchase of Bonito Village. Bonito concedes that he lodged no objection to the instructions, but urges that the failure to specify that the bribe had to be given in connection with *New Haven* business, as was alleged, worked a constructive amendment of the indictment, a *per se* Fifth Amendment violation.

The government, in response, argues that the Housing Authority's potential purchase of Bonito Village was the business of *both* New Haven and the Housing Authority, so there was no error at all if the jury found that the bribe was intended to influence De-Matteo in connection with the Bonito Village deal, and that the instructions as a whole made clear that the bribe had to be in connection with New Haven business.

■ In regard to his first argument, Bonito vigorously contends that if the phrase, "business or transaction of the organization involving at least $5,000," is read so that the organization need not have a financial interest in the corrupted business or transaction, the statute no longer serves its intended purpose of " 'protect[ing] the integrity of the vast sums of money distributed through federal programs.' " *United States v. Coyne*, 4 F.3d 100, 109 (2d Cir.1993) (quoting S.Rep. No. 225, 98th Cong., 2d Sess. 369–70 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510–11). In other words, he argues, the affected organization (New Haven), although meeting the jurisdictional requirement of having re-ceived at least $10,000 of federal monies within one year of the offense, did not have at least $5,000 at stake in the corrupted business or transaction. Thus, he maintains, there is no connection between the corrupted business or transaction and the protection of federal funds. Without such a link, § 666 would be an instrument that could reach any substantial corruption within a state or local government whether or not there were any " 'significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State or local governments pursuant to a federal program,' " *id.*, Congress's target in passing § 666.

We acknowledge the force of this argument. On the other hand, there are a number of factors in favor of construing § 666 to cover corruption of agents of a federally funded organization even in those official activities that do not implicate their organization's own funds. First, the actual wording of the statute arguably allows room for a more expansive reading. "Business," broadly defined, includes "work," "professional dealings," "one's proper concern," and "serious work or endeavor that pertains to one's job." American Heritage Dictionary 180 (1973). Also, at least on its face, the statute does not say that the thing of value of $5,000 must be that of the affected organization. It says only that the corruption must be in connection with the organization's business or transaction "involving" a thing of value of $5,000 or more. In addition, we have already extended the statute beyond corruption in a local organization's administration of a federally funded program. *United States v. Coyne*, 4 F.3d at 110. The rationale for this was stated most succinctly by the Fifth Circuit: "It is sufficient that Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organization that receives them." *United States v. Westmoreland*, 841 F.2d 572, 578 (5th Cir.1988). Yet, if the organization has no financial stake whatsoever in the corrupted business, how far, if at all, should § 666 reach beyond the organization whose integrity is sought to be protected to satisfy the requirement that more than $5,000 be involved?

■ We shall not attempt to chart the outermost bounds of § 666 here. It is sufficient to say that we consider "business" as something different from, and often broader than, "transaction." For present purposes, we would define it to include the dealings of a government official in connection with a discrete transaction. This complements the sense of "transact" and "transaction," which imply a concluded business agreement. American Heritage Dictionary 1362 (1973).

In the case at bar, the mayor of New Haven had directed that no site be accepted by the Housing Authority for the placement of low income housing without his prior approval. He placed DeMatteo, as his agent, on the joint New Haven–Housing Authority committee to represent New Haven's interests in site selection. Whether the Housing Authority had sole legal authority for site selection, it had decided to cooperate with the City, and, in fact, the only site it approved and sent to HUD for its consideration was endorsed by DeMatteo in his capacity as the City's representative. This enterprise—deciding on the location of scattered site housing—was being conducted in close cooperation between the City and the Housing Authority. It was, at all times relevant to this case, the business of both. Further, we cannot ignore that this joint enterprise was one that would determine the disposition of federal grant monies. If the corruption of an organization's official in the administration of non-federal monies can trigger § 666 because of the indirect infection of the federal monies that organization receives, so, it seems to us, should the corruption of an official as he plays a significant, if not dominant, role in the improper disposition of federal monies by another organization. Thus, in this case, the fact that no New Haven funds were implicated by DeMatteo's corrupt activities does not place Bonito's conduct outside the scope of § 666. This conclusion does no violence to the actual words of the statute, and, based on the unusual fact that federal funds were sought to be corrupted through the Housing Authority, serves the statute's underlying purpose. It would be quite another case if the corrupted business affected neither the financial interests of the protected organization nor, as in this case through the Housing Authority, federal funds directly.

■ Bonito's second argument is that the charge did not require the jury to make a fact finding on the essential element that the bribe was made in connection with New Haven business. Since the jurors were told the bribe had to be in connection the business "of *any* local government," they may have simply found a link to the business of the Housing Authority, rather than the City of New Haven, as was charged in the indictment. Such a finding, Bonito concludes, would have worked a constructive amendment of the indictment.

■ It is axiomatic that specific claimed errors in a jury charge must be scrutinized in the context of the charge as a whole. *E.g., United States v. Coyne,* 4 F.3d at 113. Our review of the whole charge leaves us skeptical, at best, that the jury would not have understood that the bribe had to be in connection with New Haven's business. At three separate points, the court's instructions strongly implied the required connection between the bribe and New Haven business. First, in providing an overview of the elements, the court stated that the third element required proof that Bonito "intended to influence or reward the local government agent in connection with any business ... of the local government." Since it was not contested that DeMatteo was an agent of New Haven, this phrase necessarily meant that the bribe had to be made in connection with New Haven business. The same logic applies to the court's instruction that the second element of the crime would be satisfied if "DeMatteo was an agent of a local government and ... Bonito gave ... him something of value, at least in part with the intent of influencing or rewarding [him] in connection with his official duties." This phrase could only have meant that the bribe must have been in connection with Bonito's official duties as an agent of New Haven.

Finally, immediately after using the phrase that Bonito assigns as error, the court continued in a fashion that again reinforced that the bribe had to have been made in connection to New Haven's business:

The third element that the government must prove beyond a reasonable doubt is that the defendant Bonito intended to influence or reward Joseph DeMatteo in connection with any local *government* business or transaction involving anything of value of $5,000 or more. If you find that the *government* business or transaction in question had a value of at least $5,000, then [this element is satisfied]. However, if you determine that the value of the *government* business or transaction was less than $5,000, you must find the defendant not guilty of the offense.

The fourth element ... is that the City of New Haven received in any one year period federal benefits in excess of $10,000 ....

(emphasis added.) Since the same government whose business had to involve at least $5,000 also had to receive in excess of $10,000 in federal funds, and since New Haven was expressly named as the government that had to receive the requisite federal funds, this part of the instruction also indicated that the bribe had to be in connection with New Haven business.

Thus, while the instruction would have been more precise if it identified New Haven individually, the failure to do so did not inevitably led the jury to focus exclusively on the business of the Housing Authority. At trial, had objection been lodged to the imprecision, the judge would have been well advised to correct it. But on appeal, and in light of the charge as a whole, we see no error so obvious and seriously prejudicial to Bonito's substantial rights as to constitute plain error.

### B. *Sufficiency*

Bonito also challenges the sufficiency of the evidence to support his conviction. In assessing this claim, we view the evidence and the inferences it raises in the government's favor. *E.g., United States v. Scarpa,* 913 F.2d 993, 1003 (2d Cir.1990). Seen in this light, there was sufficient evidence upon which a rational jury could have found each of the required elements of the

crime to have been proven beyond a reasonable doubt.

The government had to prove that Bonito (1) gave DeMatteo a thing of value (2) with corrupt intent to influence or reward an agent of a federally funded organization, in this case New Haven, (3) in connection with New Haven business or transactions (4) involving anything of value of $5,000 or more.

The first element is easily satisfied. Bonito gave DeMatteo a new Mercury Tracer for which he paid $9,500, and, even if we are to take the "Promissory Note" at face value, he only required $8,200, to be paid back over the course of one year, in return. The second element, that the bribe was given with corrupt intent to influence or reward an agent of New Haven, is also adequately supported.[2] There was no evidence that DeMatteo ever made any of the required payments under the Note, and Bonito took no action to collect until after a corruption investigation was made public. Thus the jury could have concluded that the Note itself was a sham designed to insulate the car bribe from discovery. Instead of paying back Bonito for the car, DeMatteo undertook a range of activities that inhered to Bonito's financial benefit. These included steering the two temporarily displaced tenants to Bonito-owned properties and authorizing payment of $12,800 to him, and exercising his authority as a New Haven representative on the joint New Haven–Housing Authority committee to support the purchase of Bonito Village. While the defendant offers innocent explanations for these events, there was enough evidence to allow the jury to find that the two had corruptly agreed that Bonito would give the car bribe in exchange for these favors. On the third element, as discussed above, DeMatteo's efforts on Bonito's behalf were taken in his capacity as a representative of New Haven. Based on this conduct, it was rational for the jury to find that the bribe was given in connection with New Haven business. Since the Bonito Village deal was set for over $1.1 million, the jury also reasonably

2. It is not contested that New Haven received the requisite federal funds. There is also no question that DeMatteo was a New Haven agent.

concluded that more than $5,000 was involved.

## C. *Sentence*

Bonito's sentencing proceedings were somewhat unusual, and we set them out in detail.

 Sentencing proceedings commenced on April 4, 1994. It was undisputed that Bonito's criminal history category was I and his offense level was 14, resulting in a guideline range from 15 to 21 months. Based on letters from Bonito's physicians, however, the court determined that he suffered serious impairments from cancer, diabetes, hypertension, and gout, and it departed downward on that ground:

> Therefore, it is the sentence of this court—first the court will depart downward from offense level 14 to offense level ten based upon your serious medical condition.... And it is the sentence of this court that you be committed to the custody of the Bureau of Prisons for a period of six months, with a recommendation that your placement be in a medical facility. The sentence is on count one of six months. Sentence on count three is six months to run concurrent with the sentence imposed on count one.
>
> You are to be placed on supervised release for a period of three years following your release from incarceration.
>
> Special assessment of $50 on each count for a total of $100 is imposed....

Immediately thereafter, the prosecutor noted that the court had failed to impose a fine, which, based on an offense level of 10, should have been between $2,000 and $20,000. U.S.S.G. § 5E1.2(c)(3). This was entirely appropriate: since the fine was mandated by the Guidelines, the district judge was required to give an explanation before waiving its imposition. 18 U.S.C. § 3553(c)(2).

After the prosecutor objected, the court did explain why it had not imposed a fine: Bonito had submitted a financial statement attesting to his inability to pay. The prosecutor immediately stated that he had not received the financial statement for review. Upon briefly examining it, he stated that he had information indicating that Bonito could indeed pay a fine, specifically that Bonito had filed a complaint with a local police department alleging that $70,000 in cash had been stolen from the trunk of his car, and that there had been monthly transfers of up to $100,000 in Bonito's Florida bank accounts. Thereafter the prosecutor suggested that the proceedings be adjourned to allow a more complete investigation of Bonito's financial status and whether his financial statement was false. The court stated that "[i]f a false statement had been submitted to the court with a view toward influencing the court's decision with respect to the sentence or whether or not a fine is in order, that would be very relevant" to sentencing.

The court then stated its inclination to impose a fine of $20,000, but it was clear that whether or not a fine was to be imposed remained open:

> All right, this is what the court will do. In addition to the penalties already imposed with respect to count one, the court will impose a fine of $20,000, which is ... the top of the guideline range, and if [defense counsel] wants to present evidence ... that his client is unable to pay that fine, the court will entertain that submission, and of course the government will have an opportunity to respond.

The prosecutor suggested that, instead of proceeding in this manner, it would be preferable not to impose any sentence and adjourn the proceedings to allow the court to first consider further submissions. The court agreed, and the matter was continued until April 28, 1994.

Each party filed supplemental materials concerning Bonito's financial status before the next proceeding. The government's submission showed that, between August 1993 and February 1994, over $400,000 in cash had been transferred through Bonito's Florida bank accounts. These transfers had occurred at a time when the Federal Deposit Insurance Corporation and the Branford Savings Bank had made demands for payment of outstanding loans of $2.5 million and $1.5 million, respectively. Bonito, for his part, submitted numerous betting slips showing gambling losses of $330,000 in 1993–1994.

At the second proceeding, Bonito argued that the betting slips proved the accuracy of his financial statement that he could not pay a fine. The government, shifting gears, did not press the issue of the applicability of a fine. Instead, it argued that the betting slips showed that Bonito was well enough to travel extensively to gamble, in addition to managing his numerous rental properties and other real estate activities in New Haven. The government concluded that the downward departure for ill-health, which the court had found appropriate at the first proceeding, should not be granted.

The court ultimately agreed with the government. It imposed no fine, but neither did it depart based on Bonito's medical condition. On counts one and three it imposed concurrent sentences of fifteen months' incarceration and three years' supervised release, recommending to the Bureau of Prisons that Bonito be housed at an institution that could accommodate his medical needs.

■ On appeal, Bonito claims that the district court was without power to alter the terms of the sentence it originally had "imposed" on April 4. In relevant part, 18 U.S.C. § 3582(c) provides that: "The court may not modify a term of imprisonment *once it has been imposed* except ... [if] expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure" (emphasis added). Rule 35 allows modification only after remand from a court of appeals, a change in circumstances caused by defendant's substantial assistance to the government, or if the sentence was based on arithmetic, technical or other clear error. Fed. R.Crim.P. 35. No other statute is relevant.

Defendant urges that his sentence was imposed the moment the judge concluded his initial articulation of sentence, citing *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir.1974). But, as we made clear in *United States v. Carbone*, 739 F.2d 45, 47 (2d Cir. 1984), *Marquez* stands for the limited proposition that where an "unambiguous oral sentence pronounced by the court conflict[s] with the written judgment and commitment, the oral pronouncement controls." We also made the more general observation that "[a]t sentencing proceedings[,] discussion subse-

quent to an initial ruling may result in the court's modifying its initial pronouncement, all before its ruling becomes 'final.'" *Id.* While a somewhat different legal question was involved in that case, we find this reasoning animates our interpretation of § 3582(c)'s use of the term "imposed." As indicated above, within a single, uninterrupted proceeding, at which the defendant was at all times present, the initial sentence was articulated based on a financial statement filed by the defendant that the prosecutor had not received for review, the prosecutor immediately indicated that he had contrary information, which, the court stated, would be quite relevant to its determination of sentence if true, and the court adjourned the sentencing proceeding. We see no reason for interpreting § 3582(c)'s use of "imposed" with undue rigidity, so as to lock a judge into an articulation of sentence based on misinformation, or one sided information, under these circumstances.

Since sentence was never imposed on April 4, neither Rule 35 nor § 3582(c) are implicated. The sentence ultimately imposed was within the applicable guideline, and we leave it undisturbed.

*The judgment of conviction and the sentence are affirmed.*