**UNITED STATES of America,
Appellee,**

v.

**Patricia J. FORD, Defendant–
Appellant.**

No. 03–1774.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 28, 2004.

Decided: Jan. 19, 2006.

William P. Fanciullo, Albany, New York, for Defendant–Appellant.

William C. Pericak, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, on the brief, Robert P. Storch, Senior Litigation Counsel, of counsel), Albany, New York, for Appellee.

Before: WINTER, KATZMANN, and RAGGI, Circuit Judges.

WINTER, Circuit Judge.

Patricia Ford appeals from her conviction by a jury before Judge Kahn on one count of accepting a bribe as an agent of an organization receiving federal funds. *See* 18 U.S.C. § 666(a)(1)(B). Ford was an officer of a state employees' union that received federal funds. The charges against Ford alleged that she accepted free media services for her campaign for reelection to union office in return for which she steered overpriced union work to the media services provider. On appeal, Ford contends that the jury charge was materially incorrect and the evidence was legally insufficient. She also claims that various evidentiary errors, a flawed indictment, and prosecutorial misconduct before the grand jury are grounds for reversal. We agree that the jury charge was materially incorrect, and we therefore vacate the conviction.

## BACKGROUND

We view the evidence in the light most favorable to the government. *United States v. Alfisi,* 308 F.3d 144, 146 (2d Cir.2002).

a) *The Union Election*

From August 1, 1994 through July 31, 1997, Ford was the elected Secretary/Treasurer of the Public Employees Federation ("PEF"), a union. She ran on a party slate called Members United for a Responsible Union ("MURU"). Under the governing rules, slates were elected or defeated as a whole. In the union hierarchy, Secretary/Treasurer was second in authority to the PEF President. Jim Sheedy

was the MURU candidate for President. There were three other officer positions on the slate, all carrying the title Vice–President.

The MURU slate were all incumbents, and, in preparation for MURU's 1997 reelection campaign, Ford contacted Peter Bynum, a political communications consultant recommended by PEF's parent union. Bynum met with four of the five PEF officers on February 3, 1997, to discuss the MURU reelection campaign. Two PEF projects were also discussed: an overhaul of PEF's existing communications materials and PEF's upcoming "fight back" campaign against layoffs in the Office of Mental Health. Bynum was interested in revamping the communications materials and in doing the "fight back" campaign. He testified that he believed Ford "understood" this. At the February 3 meeting or soon thereafter, Bynum learned that MURU spent $40,000 on its 1994 campaign, did not have much money for the 1997 campaign, and would have difficulty raising money.

Nevertheless, Bynum was given a "green light" at the February 3 meeting with regard to the MURU reelection campaign and began work on it thereafter. Bynum's calendar was introduced into evidence as a business record. It reflected his involvement during February in various efforts on behalf of the MURU slate, including work on a reelection brochure, a photo shoot, and a poll. Bynum eventually created three reelection brochures for MURU, which he sent to printers on March 12, April 27, and May 17.

During February and March, Bynum was also working on the PEF "fight back" campaign and apparently seeking other PEF work. In Bynum's calendar, the February 4 entry contains Ford's home address, and the February 5 entry has a note saying "Letter to Pat Ford." The February 5 entry also contains notes of a discussion about ideas for PEF's "fight back" campaign. The February 7 entry appears to list anticipated receivables for 1997 and includes $70,000 from PEF. The February 19 entry says "proposal to PEF." The February 24 entry contains a note to "Call Pat Ford re Proposals $34,000 + $60,000 = $94,000." The March 4 entry states "Talk w/ Pat re my proposal" and included a note stating "PEF—Agreed with Pat to do $4,500/mo. retainer for 12 mos. effective 8/1/97." August 1, 1997 was the date the officers elected in the June 1997 PEF election would take office.

On March 13, 1997, Bynum sent two "fight back" proposals to PEF for $85,400 and $65,400, and on March 18, he sent a third for $51,968. PEF rejected the first two proposals and accepted the third, plus a $6,000 focus group marked up by 20 percent, for a total of $58,200. The work on this project was scheduled to be finished by May 15, 1997.

Bynum told Ford that he would do the creative work on the campaign for free if Ford would consider him for future work. Bynum maintained that he also told Ford that MURU would be responsible for the printer's fees, mail house fees, and postage. Bynum expected to profit from the election work because "there would be compensation for the election work and future compensation doing work for the union if they liked my work." Bynum incurred over $2,204 of graphic design expenses on the MURU brochures and $2,207.34 in postage expenses, but he never billed MURU for any reelection work prior to the election itself.

However, Bynum did charge PEF for his work on the "fight back" campaign. On April 9, 1997, PEF received a $58,200 invoice and paid it the next day. This was more than three weeks after the first re-

election brochure went to the printer, but six weeks before the "fight back" materials were sent to the printer on May 21. President Sheedy and a vice president signed the check after Sheedy confirmed with Ford that the amount was reasonable. Bynum testified that the "fight back" bill was "somewhere between the high end of a range and inflated" because "the fact that I was doing reelection work for which I was not being particularly well compensated led me to want to make sure that I was very well compensated for the union work I was doing." Bynum believed the union would be "receptive" to high prices on the "fight back" campaign because of his re-election work.

However, MURU lost the election in June. After learning that his actions "may have appeared to be wrong," Bynum mailed an invoice backdated to September 9, 1997 and marked "past due" to Ford's home address. The invoice billed MURU $3,857.50 for the design work on the re-election campaign and $2,207.34 for postage fees paid by Bynum. This bill was never paid. MURU paid its own printing expenses for the first two reelection brochures and paid $14,470.34 in mailing expenses. The printing costs for the third brochure were not paid in advance, and MURU eventually settled the printer's claim at one-third its value.

### b) *Indictment and Trial*

On February 22, 2002, Ford was indicted on five counts: bribery under 18 U.S.C. § 666(a)(1)(B)[1] (Count 1); embezzlement (Counts 2 and 3); making a false entry in the financial records of a union (Count 4); and making a false statement (Count 5). Count 1 charged in pertinent part that

> The [PEF], during the one-year period beginning March 5, 1996 and ending March 4, 1997 received [federal] benefits of $10,000. Between on or about March 4, 1997, and on or about July 30, 1997 ... Ford, being an agent of the [PEF], an organization receiving in the one-year period beginning March 5, 1996, federal benefits in excess of $10,000.00 ... knowingly and corruptly agreed to accept and accepted something of value from Peter Bynum intending to be influenced in connection with the award of business or transactions with and of the [PEF], of a value of $5,000.00 or more.

Ford moved to dismiss the indictment because of prosecutorial misconduct before the grand jury. In support, she submitted a 51–page affirmation by counsel and a memorandum of law. The government successfully moved to strike this document, on the grounds that it contained legal argument improper in an affidavit

1.  18 U.S.C. § 666 reads in pertinent part:
    (a) Whoever, if the circumstance described in subsection (b) of this section exists—
    (1) being an agent of an organization ...
    (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization ... involving anything of value of $ 5,000 or more ....
    (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
    shall be fined under this title, imprisoned not more than 10 years, or both.
    (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $ 10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

and exceeded the page limits on memoranda of law. The court then denied Ford's motion to dismiss the indictment. Ford sought mandamus in this court and filed and then voluntarily dismissed an interlocutory appeal. Before trial, Ford successfully moved to dismiss counts 2, 4, and 5.

As noted, Bynum's calendar was admitted as a business record. Bynum testified that the calendar entries were in his handwriting and that he made them "with knowledge of the acts or events appearing in the entries." It was Bynum's "regular practice" to make calendar entries "at or near the time of the acts or events appearing in the entries" and "in the course of a regularly conducted business activity." Bynum testified, however, that he did not know "why or when" he wrote the March 4 entry about a $4,500 monthly retainer. Bynum also said that it was "possible" that he "put that in later to make myself look better." Ford unsuccessfully objected to the calendar on the grounds that it consisted of inadmissible hearsay and was more prejudicial than probative.

In instructing the jury as to Section 666(a)(1)(B), *see supra* note 1, the basis for Count 1, the court twice indicated that, with regard to both the word "corruptly" and the phrase "intending to be influenced," it was sufficient for the government to prove that Ford "understood" or was "aware" that Bynum's free media services were given to influence her conduct as an officer of the organization. Ford objected to this instruction.

With regard to Section 666(c), which excludes from the prohibitions of Section 666(a)(1)(B) "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," Ford asked the court to instruct the jury that "[t]he government must prove beyond a reasonable doubt that the transaction in issue in no way, to no degree, involved any acceptable business practice." The court declined to give such an instruction.

With regard to the time period during which allegedly criminal conduct occurred, the court stated that the jury had to find "that PEF within one year before or after the [corrupt] transaction received benefits of more than $10,000 under any federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other assistance." Ford objected, arguing that the jury could consider conduct occurring only within the one year period specified in the indictment as the period during which federal funds were received.

At the close of the government's case, Ford made a Rule 29 motion for acquittal, which was denied. The jury found Ford guilty of Count 1, bribery under 18 U.S.C. § 666(a)(1)(B), and not guilty of Count 2, formerly Count 3, which charged embezzlement. After the verdict, she renewed her motion for acquittal and made a Rule 33 motion for a new trial. The court denied both.

## DISCUSSION

Ford raises five claims on appeal: (i) the jury instructions were materially incorrect; (ii) the evidence was legally insufficient; (iii) various evidentiary errors; (iv) a fatal defect in Count 1 of the indictment; and (v) error in striking her counsel's affidavit in support of dismissing the indictment and in failing to dismiss the indictment.

a) *The Jury Instructions Regarding "Corruptly" and "Intending to be Influenced"*

We review jury charges de novo, *United States v. Han,* 230 F.3d 560, 565 (2d Cir.2000), reversing only where a charge either failed to inform the jury adequately of the law or misled the jury

about the correct legal rule, *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir.1997). We do not "review portions of [jury] instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001).

"To determine the meaning of a statute, we look first to the language of the statute itself. If those words are unambiguous, the process goes no further." *Bleecker Charles Co. v. 350 Bleecker St. Apt. Corp.*, 327 F.3d 197, 203 (2d Cir.2003) (internal quotation marks and citations omitted); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("The starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter.") (internal quotation marks and citation omitted). Only where the language of a statute is ambiguous may we look to legislative history and purpose in interpreting it. *Id.* Nevertheless, an interpretation of a statute "must comport with the statute's primary purpose and not lead to anomalous or unreasonable results." *Id.* (internal quotation marks, citations, and alterations omitted).

Section 666(a)(1)(B) prohibits in pertinent part an agent of a (federal-fund-receiving) organization from "corruptly solicit[ing] . . . for the benefit of any person, or accept[ing] . . . anything of value from any person, intending to be influenced or rewarded in connection with any business . . . of such organization." Section 666(a)(2) prohibits a person from "corrupt-

ly giv[ing] . . . anything of value to any person, with intent to influence or reward an agent of [such] an organization . . . in connection with any business . . . of such organization."

Section 666 was patterned on the general federal bribery and gratuity statute, 18 U.S.C. § 201(b)(c), *see United States v. Crozier*, 987 F.2d 893, 898 (2d Cir.1993), although the language of the two provisions differs in significant respects.[2] In *United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), the Supreme Court, in construing the general federal bribery and gratuity statute, explained the distinction between bribery—"influencing"—and illegal gratuity—"rewarding"—as follows:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Sun–Diamond*, 526 U.S. at 404–05, 119 S.Ct. 1402 (emphasis in original).

Count 1 of the indictment alleged that Ford accepted Bynum's services in aid of the MURU campaign "intending to be influenced" in connection with the award of

---

**2.** In particular, Section 201 uses "corruptly" in its bribery provision but not in its illegal gratuity provision. Section 666 uses "corruptly" as to both. *See United States v. Jennings*, 160 F.3d 1006, 1015 n. 3 (4th Cir. 1998). More importantly for our purposes, Section 201 lacks an explicit intent requirement as to recipients of alleged bribes while Section 666 contains one. *See* Note 6, *infra*.

PEF business. Given the evidence, the allegations understandably omitted the statutory words "or rewarded," and we need not explore what kinds of acts or intent are covered by the "rewarded" language but not by "influenced." *See United States v. Jennings*, 160 F.3d 1006, 1015 n. 3 (4th Cir.1998); *United States v. Coyne*, 4 F.3d 100, 111 (2d Cir.1993); *Crozier*, 987 F.2d at 898–99.

■ Appellant's objections to the district court's instructions assert that they misstated the requisite criminal intent in explaining both the meaning of "corruptly" and "intending to be influenced."

With regard to the meaning of "corruptly," the district court gave the following instruction:

Now, an act is done corruptly if it is done voluntarily and intentionally and with a bad purpose of accomplishing either an unlawful end or result or a lawful end or result by some unlawful method or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another and often involves a breach of duty. A fundamental component of a corrupt act is a breach of some official duty owed to the Government or to the public at large. A person acts corruptly when the person acts with the understanding that something of value is to be offered or given to influence her in connection with her organizational duties.

Appellant does not quarrel with the first three sentences of the district court's instructions. *See United States v. Aguilar*, 515 U.S. 593, 616–17, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (Scalia, J., dissenting) (Corruptly describes "an act done with an intent to give some advantage inconsistent with official duty and the rights of others .... An act is done corruptly if it's done

voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method, with a hope or expectation of either financial gain or other benefit to oneself or a benefit of another person.") (internal quotations and citations omitted); *United States v. Rooney*, 37 F.3d 847, 852 (2d Cir.1994) ("[A] fundamental component of a 'corrupt' act is a breach of some official duty owed to the government or the public at large."); *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir.1990) (defining "corruptly" in similar terms).

Appellant does, however, challenge as error the statement that "[a] person acts corruptly when the person acts with the understanding that something of value is to be offered or given to influence her in connection with her organizational duties." These instructions were unnecessary because they dealt with a subject that should have been adequately covered in the portion of the charge dealing with the statutory requirement that the recipient "intend[ ] to be influenced." Moreover, because they appear to have told the jury that the "corruptly" requirement was fully satisfied by the recipient's knowledge of the donor's intent and omitted any reference to the recipient's intent in accepting the thing of value, they may have confused the jury as to the specific intent required by the Section 666 count in this case, compounding the charging error as to that element.

As the Supreme Court noted in its recent decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005), restraint must be exercised in defining the breadth of the conduct prohibited by a federal criminal statute out of concerns regarding both the prerogatives of Congress and the need to give fair warning to those whose conduct is affected. 125 S.Ct. at 2134.

Moreover, as the Court also noted, "restraint is particularly appropriate ... where the act underlying the conviction ... is *by itself* innocuous." *Id.*[3] (emphasis added).

The act underlying the conviction here—accepting volunteer services and related goods in an election campaign—is, *by itself*, not only innocuous but also rather commonplace. Such services are frequently offered in the context of union and other elections. To be sure, the volunteer or donor may have arranged a *quid-pro-quo*, or be seeking special consideration as to future work if the campaign is successful. But the donor may be acting on ideological grounds or may desire only to display his or her talents in the hope of getting work later on the merits.

The use of the word "corruptly" at the very least obviates the need for a recipient to speculate on the intent with which volunteer services are offered. A recipient who knows of the donor's intent to arrange a *quid-pro-quo* or to seek special consideration may, in certain circumstances, be said to be acting "corruptly." But such knowledge is insufficient, by itself, to prove the Section 666 violation charged in this case.

The government was also required to prove beyond a reasonable doubt that Ford accepted Bynum's services "intending to be influenced" in her official duties.

The jury instructions did not clearly communicate this specific intent element.[4] They stated:

> The phrase "intending to be influenced" describes the intention conveyed by the recipient. If the recipient accepts anything of value with awareness that one of the purposes for which it is given is to influence her, rather than being done voluntarily or unrelated to her office as union treasurer, the recipient has acted with intent to be influenced. It is not a defense that a person does not intend to comply with the request of the giver, as long as the person accepting the thing of value is aware that the person for which the thing of value is offered—I'm sorry—that the reason for which the thing of value is offered is to influence her. Whether the corrupt transaction would or could ever be performed also is immaterial. It is also not a defense that something of value is accepted to influence an act which is actually lawful, desirable, or even beneficial to the union, or that the officer did not have the power, authority or ability to perform the act for which the thing of value is accepted. As long as the action sought is not so far outside the purview of the officer's duties or possible power, or possible authority, such that no reasonable person would have supposed the official could have done anything about the subject, liability attaches. The Government

---

**3.** The direct holding of *Andersen* is, although fully consistent with our decision, of marginal relevance. As the Court emphasized, the statute at issue in *Andersen* used "corruptly" to modify "knowingly," and analogies to statutes using the former but not the latter word are "inexact." 125 S.Ct. at 2136, fn. 5. The statute under present consideration does not use the word "knowingly" and the requisite state of mind is set out in the "intending to be influenced or rewarded" phrase, which appears not to be modified by "corruptly."

**4.** We recognize that the instructions in question were taken from the Seventh Circuit's Pattern Jury Instructions, which in turn rely on *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir.1995). However, the Pattern Instructions misread *Bonito*. In *Bonito*, we approved an instruction that "[a] person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a government agent in connection with his official duties." *Id.* However, *Bonito* involved a donor of a thing of value, not a recipient.

need not prove an explicit promise to perform a particular act made at the time the thing of value is agreed to or accepted. Rather, it is sufficient if the defendant understood that she was expected as a result of the payment to exercise influence on behalf of the payor as the opportunity arose. To find that the defendant had the requisite intent to commit this act, this crime, you need to determine her actual intent while she was dealing with Peter Bynum.

The instructions in question failed to clarify whether they were offering a single synthesized definition or alternative definitions of "intending to be influenced." Either way, they did not convey the plain language of the statute. Broken into its essential pertinent parts, the statute imposes criminal liability on: "Whoever ... solicits ... or accepts ... anything of value ... intending to be influenced." 18 U.S.C. § 666(a)(1)(B). "Intending to be influenced" clearly modifies "whoever," i.e. the recipient of something of value. In short, the recipient must have accepted the thing of value while "intending to be influenced." Or, as the Supreme Court put it plainly in *Sun–Diamond Growers*, there must be a *quid-pro-quo*.

If the instructions were intended to offer alternative definitions of the requisite state of mind, they were clearly in error. The first sentence of the instructions stated that "intending to be influenced" describes "the intention conveyed by the recipient." However, a jury may not, as the instructions suggest, cease further consideration upon determining that a recipient conveyed such an intent. What is conveyed or said by the recipient is of course powerful evidence of the recipient's state of mind, but what the recipient said is not the issue to be resolved. Rather, it is the actual state of mind of the recipient that must be proven.

■ The second sentence of the instructions similarly misstates the state of mind requirement.[5] The recipient's "awareness" that the donor gave something of value for the purpose of influencing the recipient might well constitute strong circumstantial evidence that the recipient acted with the requisite culpable state of mind in accepting the item, but a jury should be clearly instructed that it is the recipient's intent to make good on the bargain, not simply her awareness of the donor's intent that is essential to establishing guilt under Section 666.[6] *See* Note 5, *supra*. The final sentence, by telling the jury only that it had to find appellant's actual intent, suffered from the fatal defect of lacking an infinitive—namely, an actual

---

5. The error in the instructions that both "corruptly" and "intending to be influenced" refer solely to the recipient's "awareness" of the donor's intent may have been taken from language in various appellate opinions discussing *quid-pro-quo* arrangements in the context of Hobbs Act prosecutions. *See, e.g., Coyne*, 4 F.3d at 113–14. This case, however, involves a charged violation of a different statute, 18 U.S.C. § 666(a)(1)(B). The plain language of that statute makes clear that a recipient's knowledge of a donor's intent to influence is insufficient to support conviction. The recipient must take the proffered thing of value "intending to be influenced." 18 U.S.C. § 666(a)(1)(B).

6. This portion of the instructions may have been taken from *United States v. Myers*, 692 F.2d 823, 841–42 (2d Cir.1982). However, *Myers* involved, *inter alia*, a prosecution under 18 U.S.C. § 201(b)(2), a statute whose language differs from that of Section 666(a)(1)(B) in an important respect. In 1962, Congress revised Section 201(b)(2) to delete explicitly an "intent to be influenced" element, requiring instead that the "overall act be committed 'corruptly.'" *Id.* at 841. In contrast, under Section 666, "intending to be influenced" is an explicit element of the crime.

intent "to be influenced" in awarding PEF work to the donor in the future.

Viewed as a synthesized definition of the requisite state of mind, the instructions were similarly deficient. They simply failed to spell out the specific state of mind requirement of a bribery charge under Section 666—the defendant's intent to be influenced in awarding PEF business in return for a thing of value.

Courts do not read elements, and especially intent requirements, out of statutes lightly. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (refusing to read intent requirement out of a conversion statute even absent explicit language because intent was generally considered an element of conversion); *see also United States v. Aguilar,* 515 U.S. 593, 600, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (refusing to read intent requirement out of obstruction statute because "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed") (internal quotation marks and citation omitted). The deficiencies in the instructions therefore require that the conviction be vacated.

b) *Other Issues Raised On Appeal*

Although our determination that the jury instructions were erroneous requires that the conviction be vacated, we address the issue of whether the evidence was legally sufficient in order to determine whether a retrial is permissible. Because we conclude that the evidence was sufficient, we address other claims raised by Ford in the interests of judicial economy. *See Blyden v. Mancusi,* 186 F.3d 252, 269 (2d Cir.1999) ("Although our disposition of this matter lessens the importance to this appeal of appellant's [second] claim ... we nevertheless address it in light of the fact that retrials seem inevitable."); *United States v. Salerno,* 937 F.2d 797, 811 (2d Cir.1991) ("Since we reverse the convictions of all defendants on other grounds, it is not necessary to reach this issue in order to decide this appeal. Nevertheless, since a retrial is likely, we offer some guidance on this subject."), *rev'd on other grounds,* 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992).

1. Sufficiency of the Evidence

■ We believe that the evidence was sufficient to convict Ford under correct jury instructions. There was ample evidence, if credited, for a jury to find that Ford actually intended to be influenced in connection with PEF work after accepting free services from Bynum on her reelection campaign. The jury could have found that Bynum offered Ford free reelection services in exchange for PEF's agreement to pay (i) his inflated $58,200 "fight back" proposal and (ii) a post-election retainer at $4,500 per month. The jury could also have found, based on PEF's acceptance of Bynum's proposal and Bynum's calendar notation that Ford agreed to the retainer, that Ford accepted Bynum's offer. In doing so, such conduct would clearly have breached her duty to the union and would therefore have constituted "corruptly" accepting of something of value from Bynum while "intending to be influenced in connection with" PEF business.

2. Evidentiary Rulings

We review evidentiary rulings for abuse of discretion. *Coyne,* 4 F.3d at 114 ("[T]he trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence.") (internal quotation marks and citation omitted).

■■ Admission of Bynum's calendar as a business record was not an abuse of discretion. Bynum testified that his regu-

lar business practice was to keep a calendar in which he documented events of which he had personal knowledge at or near the time they occurred. The fact that Bynum claimed not to remember when or why he made the March 4, 1997 entry is irrelevant. If a custodian of a business record "need not have personal knowledge of the actual creation of the document," *United States v. Williams,* 205 F.3d 23, 34 (2d Cir.2000) (internal quotation marks and citation omitted), for it to be admissible, the absence of a present recollection is no barrier to admission. *See* Fed.R.Evid. 803(6). In any event, the March 4 entry was admissible under the hearsay exception for statements against penal interest. Fed.R.Evid. 804(b)(3) (permitting admission of statement that tended to subject the declarant to criminal liability). The apparent memorializing of a retainer agreement between Bynum and Ford could have been used against Bynum in a Section 666(a)(2) prosecution as well.

▮ Ford also challenges the district court's exclusion of an Assistant United States Attorney's alleged extra-judicial statement to a witness that "Bynum is a dirty dog and he's got no credibility." This statement was offered as an admission by an agent of a party under Fed.R.Evid. 801(d)(2)(D).

Exclusion was not an abuse of discretion. Admission of an opinion of a lawyer as to credibility would be problematic under Rule 403, *see United States v. Scop,* 846 F.2d 135, 139–40 (2d Cir.1988) and, at least in the present circumstances, is not admissible under Rule 801(d)(2)(D). Although a government attorney's statements may be admitted against the government as a litigant, *Salerno,* 937 F.2d at 812, such statements must meet three criteria:

First, "the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial." Second, the court must determine "that the statements of counsel were such as to be the equivalent of testimonial statements" made by the client. Last, the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw "is a fair one and that an innocent explanation for the inconsistency does not exist."

*Id.* at 811 (quoting *United States v. McKeon,* 738 F.2d 26, 33 (2d Cir.1984)). "[A]dvocacy as to the credibility of witnesses" does not meet at least the first two criteria. *McKeon,* 738 F.2d at 33.

### 3. Temporal Period of Offense

Ford objects to the court's instruction that, with regard to the temporal element of the crime, the jury had to find only that PEF received $10,000 in federal money "within one year before or after the [alleged bribe]." Ford argues that this instruction constituted a constructive amendment of the indictment because it allowed the jury to consider transactions occurring outside the one-year period specified in Count 1 during which $10,000 in federal benefits were received by PEF—March 5, 1996 to March 4, 1997. The evidence showed that PEF received more than that amount on both July 24, 1996 and December 30, 1996 and that Ford's acceptance of services from Bynum occurred from March–June 1997. Ford's argument appears to be that, under the indictment, the PEF might have received the requisite federal benefits only on March 5, 1996, and any conduct after March 4, 1997 could not be criminal because the criminal conduct had to be committed within a year of the receipt of benefits.

▮ A constructive amendment occurs when "the terms of the indictment are

in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Delano,* 55 F.3d 720, 729 (2d Cir.1995) (internal quotation marks and citation omitted). Constructive amendments are *per se* violations of due process. *Id.* In determining whether an "essential element" of the offense has been modified, we have "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *Id.* (internal quotation marks and citation omitted). If the defendant was given adequate notice of that core and no substantial prejudice is shown, a challenged instruction will be deemed at most a harmless variance. *United States v. Thomas,* 274 F.3d 655, 670 (2d Cir.2001).

■ Although Count 1 of the indictment might have benefitted from some added attention, we see no possibility of Ford's defense having been misled. The Count did charge that Ford corruptly accepted something of value from Bynum between March 4, 1997, and July 30, 1997, and the indictment leaves open the possibility that the PEF received federal benefits as late as March 4, 1997. Thus, Ford was clearly given notice of the "core of criminality" to be proven, and there is no possibility that she was prejudiced by the failure of the indictment to define more precisely the date of the PEF's receipt of federal benefits.

4. Section 666(c) Jury Instruction

■ Ford challenges the court's refusal to charge the jury under Section 666(c) that "[t]he government must prove beyond a reasonable doubt that the transaction in issue in no way, to no degree, involved any acceptable business practice." Section 666(c) provides that it "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." The refusal to give the requested instruction was not error. The court read the statute to the jury, and it was free to draw its own conclusions from its non-technical terms. Ford's proposed jury charge was neither more accurate nor clearer than the statute itself. *See United States v. Morris,* 928 F.2d 504, 511 (2d Cir.1991) (concluding that it is sufficient to read statute to jury without defining terms where those terms have common usage without technical or ambiguous meaning).

5. Defense Counsel's Stricken Affidavit

We have read counsel's affidavit and concluded that nothing in it warrants relief. Therefore, the district court's striking it was harmless whether or not error.

CONCLUSION

For the reasons stated, we vacate the conviction.