[749 NYS2d 488]

LONG ISLAND LIGHTING COMPANY et al., Appellants, v ALLIANZ UNDERWRITERS INSURANCE COMPANY et al., Respondents.

First Department, October 24, 2002

**APPEARANCES OF COUNSEL**

*David L. Elkind* of counsel (*Edward Tessler* and *Joseph F. Fields* on the brief; *Dickstein Shapiro Morin & Oshinsky, LLP*, attorneys), for appellants.

*Robert P. Firriolo* of counsel (*John G. McAndrews* and *William P. Lalor* on the brief; *Mendes & Mount, LLP*, attorneys), for respondents.

**OPINION OF THE COURT**

FRIEDMAN, J.

This appeal requires us to determine whether one of the many excess liability insurance policies at issue in this action affords coverage for the cost of remediating soil and groundwater contamination that was caused by the operation of plants that closed years before the inception of the policy period. The insured argues that coverage exists, notwithstanding that no new contaminants were discharged during the policy period,

because preexisting contaminants continued to migrate during the policy period. The insurers argue that the loss is not covered because there was no causal "occurrence" within the meaning of the policy during the policy period. We agree with the insurers, and therefore affirm the grant of partial summary judgment to them on this issue.

This appeal also presents the question of whether the insured waived any attorney-client privilege attaching to an internal report coauthored by its in-house counsel by inadvertently producing it in a prior related action, or by placing the subject matter of the report in issue in this action. We hold that, on this record, there was no waiver of privilege, and the insured's motion for a protective order should therefore have been granted. Finally, we vacate Supreme Court's imposition on the insured of an unduly punitive mechanism to deal with the privilege issues created by the erroneous finding of waiver.

FACTS

*General Background*

Plaintiff Long Island Lighting Company (LILCO) and its predecessors in interest formerly operated seven plants at which gas for lighting and heating was manufactured from a derivative of coal. Six of these plants, known as "manufactured gas plants" (MGPs), had ceased operating by the late 1950s; the seventh plant, located at Bay Shore, New York, closed in 1973. While the plants were operational, the gas manufacturing process produced solid and liquid waste residues that contaminated soil and groundwater at the sites.

Defendants are several insurance carriers that sold LILCO excess commercial general liability policies. LILCO commenced this action for the purpose of obtaining a declaration that defendants are obligated to provide LILCO with defense and indemnification in connection with LILCO's potential liability to remediate the environmental damage at the MGP sites. Defendants have raised defenses of late notice. LILCO denies that it gave late notice of the claims, and further avers that defendants waived any defense of late notice by failing to disclaim coverage on that ground in timely fashion. The merits of the parties' respective contentions as to late notice and untimely disclaimer are not at issue on this appeal.

*The 1970-1972 Policy*

This appeal does raise the issue of whether LILCO is afforded coverage for the six MGP sites that were closed as of the late 1950s under the terms of one of the policies issued by

one group of defendants, Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies (collectively, the London Defendants). This policy (the 1970-1972 Policy) provided coverage for the period from March 1, 1970 through December 31, 1972,[1] and provided in pertinent part as follows:

"INSURING AGREEMENTS

"I. COVERAGE

"This policy is to indemnify:

"(a) the named Assured and/or the Assureds as defined in the definitions for any and all sums which they shall be legally obligated to pay and shall pay or by final judgment be adjudged to pay (*subject to the limitations hereinafter mentioned*) to any person or persons * * * by reason of damage to or destruction of property, by reason of or resulting from any trade or business of the named Assured including the performance of services by or on behalf of such Assured in connection with said trade or business. * * *

"II. LIMIT OF LIABILITY

"It is expressly agreed that the Underwriters shall only be liable hereunder for the ultimate net loss *as a result of any occurrence* covered under Insuring Agreement I (a) * * *" (emphasis added).

Elsewhere, the 1970-1972 Policy defined the term "occurrence" to mean "one happening or series of happenings *arising out of or caused by one event taking place during the term of this contract*" (emphasis added).

In May 1999, the London Defendants moved for, among other relief, partial summary judgment declaring that the 1970-1972 Policy did not cover claims relating to the six MGPs that closed prior to 1970. The London Defendants argued that LILCO was not entitled to coverage for these sites under the 1970-1972 Policy because coverage under the Policy, pursuant to their "Limit of Liability" provision (paragraph II of the "Insuring Agreements"), was triggered only by an "occurrence" during

1. This appeal does not raise any issue as to the scope of coverage under the other policies issued by the London Defendants, or as to the scope of coverage under any policy issued by the other defendants. Nor does the appeal raise any issue as to whether the 1970-1972 Policy provides coverage for liability arising from the MGP that closed in 1973.

the policy period that caused the damage giving rise to the liability. According to the London Defendants, the "occurrence" that caused the damage at issue was the operation of the plants, which, in the case of the six MGPs that had closed by the late 1950s, came to an end many years prior to the inception of the policy period on March 1, 1970.

In response, LILCO argued that the London Defendants overlooked the fact that the Policy's "Coverage" provision (paragraph I[a] of the "Insuring Agreements") did not utilize the word "occurrence," but provided that coverage would be triggered by "damage to or destruction of property." From this, LILCO drew the conclusion that the Policy was susceptible to the interpretation that ongoing property damage during the policy period, such as continued leaching of contaminants through the soil, was sufficient to trigger coverage, and that no causative "occurrence" during the policy period was required. Therefore, LILCO argued, the 1970-1972 Policy was ambiguous as to whether a causative "occurrence" during the policy period was required to trigger coverage, and the issue could only be resolved after trial.

*The December 1993 Report*

In response to the same motion by the London Defendants, LILCO cross-moved for a protective order as to a December 1993 internal report coauthored by LILCO's Environmental Engineering Department and Legal Department, entitled "Manufactured Gas Plant Sites: Hempstead Gas Plant, Bay Shore Gas Plant—Investigation Summary and Remediation Strategy Recommendations" (hereinafter, together with its transmittal memorandum, the December 1993 Report). The December 1993 Report, which was marked "Privileged and Confidential—Attorney Work Product—Attorney-Client Communication," analyzed the federal and state statutory and regulatory framework relevant to MGP sites in New York, discussed the anticipated action of the regulatory agencies concerned, summarized the results of LILCO's investigation of the environmental damage at the two sites, set forth several remediation options for each site and the estimated cost of each option, and offered recommendations for the option to be implemented for each site and the strategy to be pursued in negotiations with the regulators. The recommendations made in the December 1993 Report were based on a combination of factors, legal as well as scientific and economic.

In a prior federal court action seeking substantially the same relief as this action (the Federal Action), LILCO had inadvert-

ently turned the December 1993 Report over to defendants as part of a production comprising hundreds of thousands of documents. After LILCO produced the December 1993 Report, and before any proceedings addressed to the merits of the action were conducted, the Federal Action was dismissed for lack of diversity jurisdiction. LILCO then commenced this action.

In a branch of their May 1999 motion that is not at issue on this appeal, the London Defendants sought summary judgment based on the contention that LILCO failed to give timely notice of any of the claims for which coverage was sought. In support of this contention, the London Defendants relied on the December 1993 Report, among other documents. Promptly after this motion was served, LILCO notified opposing counsel that the December 1993 Report had been produced inadvertently in the Federal Action, asserted that the Report was protected by the attorney-client privilege, and demanded that all copies of the Report be returned. When defendants did not honor this request, LILCO made its cross motion for a protective order. The request for a protective order was supported by an affirmation of the in-house attorney who coauthored the Report, attesting that a primary purpose of the document had been to provide legal advice, and an affirmation of LILCO's litigation counsel, attesting that the Report had been inadvertently produced in the Federal Action in spite of measures that had been taken to screen for privileged material.

*The October 2000 Order*

In its order entered on or about October 24, 2000, Supreme Court granted the branch of the London Defendants' motion seeking partial summary judgment declaring that the 1970-1972 Policy did not afford coverage for the six MGP sites at which operations ceased prior to 1970. The court agreed with the London Defendants that the terms of the 1970-1972 Policy unambiguously required that a "causative event * * * take place during the policy period" to trigger coverage. In this case, the court concluded, "[t]he causative event occurred when the initial pollution was released or discharged during the plant operations" (citation omitted), so as to exclude coverage as to the six MGP sites that were closed prior to the policy period.

Also by the October 2000 order, Supreme Court denied LILCO's cross motion for a protective order. The court found that, although the discussion of "legal and business considerations * * * [were] intertwined" in the December 1993 Report so as to render the document privileged as a whole, LILCO had waived any privilege attaching to the Report by producing it in

the Federal Action, and by placing the subject matter of the Report "in issue" in this action. Although defendants, in opposing LILCO's cross motion, had not argued that LILCO failed to demonstrate that its screening measures in the Federal Action were reasonable, the court noted in support of its finding of waiver that LILCO's representation that it had screened for privileged documents was not supported by "specifics as to [the screening] measures taken * * *."

*The October 2001 Order*

In November 2000, LILCO moved for, inter alia, renewal of the October 2000 order insofar as it denied LILCO's cross motion for a protective order as to the December 1993 Report. In support of its motion for renewal on this issue, LILCO submitted an additional affirmation of counsel setting forth in greater detail the steps it had taken to screen for privileged documents in preparing its document production in the Federal Action.

By order entered on or about October 31, 2001, Supreme Court, as here pertinent, denied LILCO's motion for renewal insofar as addressed to the request for a protective order. The court found that LILCO was not entitled to renewal under CPLR 2221 because the details of screening measures set forth in the supporting affirmation of counsel had been available to LILCO at the time of its initial cross motion.

The October 2001 order also established a mechanism to resolve the privilege issues generated by the earlier determination in the October 2000 order that LILCO had placed the subject matter of the December 1993 Report at issue. That ruling put in question the viability of LILCO's assertion of privilege as to each document potentially relevant to the notice issue. To resolve such issues, the October 2001 order put in place a "Spot Check System," under which LILCO was required to turn over to the court all documents that it continued to withhold on grounds of privilege. Supreme Court would conduct an in camera "spot check" of an unspecified number of the documents turned over, and, if any document reviewed in the spot check were found to have been erroneously withheld in light of the earlier ruling on the December 1993 Report, LILCO would be ordered to produce all withheld documents to defendants.

### ANALYSIS

▮ For the reasons discussed below, we affirm the grant of partial summary judgment to the London Defendants as to the extent of coverage under the 1970-1972 Policy. We find that

Supreme Court erred, however, in ruling that LILCO had waived any privilege as to the December 1993 Report, and in imposing the Spot Check System on LILCO.

*Extent of Coverage Under the 1970-1972 Policy*

There are two questions to be answered in connection with the coverage issue under the 1970-1972 Policy. The first question is whether an "occurrence" taking place during the policy period that caused the relevant property damage was required to trigger coverage under the Policy. The second question, which arises only if the first question is answered in the affirmative, is whether any such "occurrence" took place during the policy period in this case. We answer "yes" to the first question, and "no" to the second.

Turning to the first question, we agree with Supreme Court's conclusion that the 1970-1972 Policy unambiguously required that a causative "occurrence" take place during the policy period in order to trigger coverage. In this regard, we note that each provision of the Policy must be read in the context of the entire agreement, not in isolation, in order to determine the intent of the parties (*see Bijan Designer For Men v Fireman's Fund Ins. Co.*, 264 AD2d 48, 51-52). Here, the "Coverage" provision of the Policy (paragraph I[a] of the "Insuring Agreements"), although not containing the word "occurrence," provided that the insurers' duty to provide coverage thereunder is "subject to the limitations hereinafter mentioned." The reference to the "limitations hereinafter mentioned" must mean the immediately following portion of the Policy entitled "Limit of Liability" (paragraph II of the "Insuring Agreements"), which provided that the insurers' liability is limited to "the ultimate net loss *as a result of any occurrence * * *"* (emphasis added). Thus, the "Coverage" provision of the Policy incorporates by reference the "Limit of Liability" provision's limitation of the insurers' liability to losses resulting from an "occurrence."

Even if the "Coverage" provision did not expressly incorporate by reference the limitations of the "Limit of Liability" provision, we would construe the limitation of liability provision to similarly limit coverage. Plainly, there can be no "coverage" for a loss if any liability for that loss would exceed the "limit of liability" under the policy, which requires an "occurrence." "[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" (*Proyecfin de Venezuela, S.A. v Banco Indus. de Venezuela, S.A.*, 760 F2d 390, 395-396 [2d Cir]).

Since we hold that coverage under the 1970-1972 Policy is triggered by an "occurrence," the question that emerges is

whether the ongoing migration or leaching of preexisting contaminants through the soil, which for our purposes we will assume continued during the policy period, can be deemed to constitute an "occurrence" under the contractual definition of that term ("one happening or series of happenings arising out of or caused by one event taking place during the term of this contract"). In prior decisions construing an identical, or nearly identical, definition of the word "occurrence" in liability policies in which, as we have demonstrated to be the case here, coverage was triggered by an "occurrence," courts have concluded that the definition was satisfied where an event during the policy period *caused* the damage or injury for which indemnity was sought (*see Public Serv. Elec. & Gas Co. v Certain Underwriters at Lloyd's of London*, 1994 US Dist LEXIS 21072, \*13-16 [D NJ, Sept. 30, 1994 (CA No. 88-4811)]; *see also Indiana Gas Co., Inc. v Aetna Cas. & Sur. Co.*, 951 F Supp 780, 787-789 [ND Ind], *vacated on other grounds and reh denied sub nom. Indiana Gas Co., Inc. v Home Ins. Co.*, 141 F3d 314, *cert denied sub nom. Certain Underwriters at Lloyd's London v Indiana Gas Co., Inc.*, 525 US 931; *Pacific Resources, Inc. v Oswego Shipping Corp.*, 1984 WL 928, \*4, 1984 US Dist LEXIS 23253, \*10-11 [SD NY, Sept. 26, 1984, No. 79 Civ 1606]). Under policies providing occurrence-triggered coverage that contain such a definition of "occurrence," it has been held that the fact that the damage itself existed during the policy period does not afford coverage where the event that caused the damage preceded the policy period (*see Public Serv. Elec. & Gas* [the policy did not provide coverage for soil contamination caused by gas manufacturing that ended prior to the policy period, notwithstanding that contaminants may have continued to migrate during the policy period]; *Indiana Gas. Co.* [same]).

We concur with the results reached in the cited decisions. The contractual definition of "occurrence" expressly requires that the loss be occasioned by "one event taking place during the term of this contract." To accept LILCO's argument that the continuing leaching or migration of preexisting contaminants after the closing of the plants should be deemed to constitute the "event taking place during the term of this contract" (under the definition of "occurrence"), we would have to ignore the fact that the definition requires that the "event taking place during the term of this contract" be the *cause* of the "happening or series of happenings" immediately giving rise to the loss. It would be illogical to deem the continuing migration of preexisting contaminants to be both the damage itself and the

cause of the damage (*cf. Matter of Midland Ins. Co.*, 269 AD2d 50, 59, 61 [where policy was triggered by "continuous or repeated exposure" to conditions which result in personal injury, "[t]he trigger event in the policy * * * is *an occurrence which results in injury,* not the injury itself"] [emphasis in original]). Plainly, the event that caused the damage in this case was the operation of the plants, which, at six of the sites, ceased many years prior to the term of the 1970-1972 Policy. Once the plants were closed, no additional contaminants were discharged. Accordingly, the 1970-1972 Policy does not afford LILCO coverage for liability relating to these sites.[2]

*Whether Privilege Was Waived as to the December 1993 Report*

■ Turning to the issues relating to the December 1993 Report, we find, contrary to Supreme Court's view, that LILCO established in its initial cross motion for a protective order that it did not waive any privilege attaching to the December 1993 Report by inadvertently disclosing it in the Federal Action. The affirmations of LILCO's attorneys attested that LILCO had always regarded the December 1993 Report as a privileged attorney-client communication, that LILCO had used a screening process in preparing its document production in the Federal Action, and that the production of the Report among hundreds of thousands of other documents had been an inadvertent error. Significantly, although LILCO's initial cross motion papers did not elaborate on the nature of the screening measures it had used, defendants did not argue that LILCO failed to establish that such screening measures had been reasonable. LILCO further established that, upon learning of the inadvertent disclosure of the Report from the London Defendants' summary judgment motion in this action, it had promptly invoked the privilege, demanded the return of the document, and sought a protective order when its demand was refused. Moreover, a protective order will not unfairly prejudice defendants, as it is undisputed that defendants ultimately sought summary judgment on the late-notice issue in Supreme Court based on more than 200 documents other than the December 1993 Report. For all these reasons, we conclude that

---

2. We find unpersuasive LILCO's argument that different meanings should be ascribed to the terms "arising out of" and "caused by" in the contractual definition of "occurrence." We also note that whether or not a contract is ambiguous is a question of law for the court, as to which expert testimony is not cognizable. Thus, we have no occasion to consider the affidavit of a purported expert, submitted by LILCO, which characterizes the 1970-1972 Policy as ambiguous.

LILCO's initial showing in support of its cross motion for a protective order was sufficient, under applicable standards, to negate any inference of waiver of privilege that might otherwise arise from the disclosure in the Federal Action (*see John Blair Communications v Reliance Capital Group*, 182 AD2d 578, 579, citing *Manufacturers & Traders Trust Co. v Servotronics, Inc.*, 132 AD2d 392, 398-400).

We also disagree with Supreme Court's view that LILCO has placed the subject matter of the December 1993 Report at issue in this action. That the Report may contain information relevant to the issue of timeliness of notice does not mean that the Report itself is at issue so as to waive any attorney-client privilege attaching thereto. In this regard, we observe that information concerning LILCO's knowledge of its potential liability for environmental damage at MGP sites is apparently available from numerous nonprivileged sources (*see Manufacturers & Traders Trust Co. v Servotronics, Inc.*, 132 AD2d at 396; *Jakobleff v Cerrato, Sweeney & Cohn*, 97 AD2d 834, 835-836; *see also North Riv. Ins. Co. v Columbia Cas. Co.*, 1995 WL 5792, *6, 1995 US Dist LEXIS 53, *16-17 [SD NY, No. 90 Civ 2518]). Moreover, LILCO does not seek to justify any delay in its giving notice to defendants as based upon the advice of counsel (*cf. Orco Bank v Proteinas Del Pacifico*, 179 AD2d 390).

Since LILCO's initial cross motion for a protective order should have been granted, the question of whether such relief should have been granted on LILCO's motion for renewal becomes academic. We further note that defendants have not requested that this Court determine whether the December 1993 Report is privileged in the event of a finding of nonwaiver. Since we understand Supreme Court to have made a finding in its October 2000 decision that the Report would be privileged in its entirety absent any waiver, and we are not asked to review that finding, LILCO should simply be granted the protective order it sought. Thus, there is no occasion to remand the privilege issue to Supreme Court for further consideration.

*The Spot Check System*

Finally, for two independent reasons, we vacate the October 2001 order to the extent it imposed the Spot Check System on LILCO. First, the Spot Check System was devised to avoid the potential for interminable litigation on privilege issues that had been created by the court's ruling that LILCO had put "in issue" the subject matter of the December 1993 Report. Since we now hold that the court's ruling on the December 1993 Report was erroneous, the problem created by that ruling is

obviated, and there is no longer any reason to impose the Spot Check System on LILCO as a means of dealing with that problem. Even if the court's ruling on the December 1993 Report were not in error, however, we would vacate the Spot Check System on the ground that the advance sanction involved—deeming the erroneous withholding of even a single document to waive privilege as to all withheld documents, without regard to the circumstances of the erroneous withholding—is so unduly punitive as to constitute an abuse of the court's discretion in the supervision of discovery (*cf. Corner Realty 30/7 v Bernstein Mgt. Corp.*, 249 AD2d 191; *Commerce & Indus. Ins. Co. v Lib-Com, Ltd.*, 266 AD2d 142; *Kaplan v KCK Studios*, 238 AD2d 264).

Accordingly, the order of the Supreme Court, New York County (Ira Gammerman, J.), entered on or about October 24, 2000, which, insofar as appealed from, as limited by the briefs, granted the London Defendants partial summary judgment declaring that plaintiffs are not covered for the claims relating to the Glen Cove, Patchogue, Rockaway Park and Sag Harbor properties by the policy issued by the London Defendants in effect from March 1, 1970 through December 31, 1972, and denied plaintiffs' cross motion for a protective order, should be modified, on the law, to grant the cross motion for a protective order to the extent of prohibiting defendants from making any use of the December 1993 Report and directing defendants to return all copies of said document to plaintiffs, and otherwise affirmed, without costs; and the order of the same court and Justice, entered on or about October 31, 2001, to the extent it provided, as an advance sanction for the withholding by plaintiffs of any purportedly privileged document which the court determined to be nonprivileged on a "spot check" basis, that plaintiffs would be directed to produce all documents withheld from production on grounds of privilege (the Spot Check System), should be reversed, on the law, the facts and in the exercise of discretion, without costs, to vacate all portions of the order that imposed the Spot Check System.

ANDRIAS, J.P., ROSENBERGER, LERNER and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered on or about October 24, 2000, modified, on the law, to grant plaintiffs' cross motion for a protective order to the extent of prohibiting defendants from making any use of the December 1993 Report and directing defendants to return all copies of said document to plaintiffs, and otherwise affirmed, without costs; and order,

same court, entered on or about October 31, 2001, reversed, on the law, the facts and in the exercise of discretion, without costs, to vacate all portions of the order that imposed the Spot Check System.